## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
AYMAN FAREH SOLIMAN,                  )
)
                    Plaintiff,        )
)
             v.                       )        Civil Action No. 22-0079 (ABJ)
)
ALEJANDRO MAYORKAS                    )
*in his official capacity as*         )
*Secretary of the Department*         )
*of Homeland Security*, *et al.*,     )
)
                    Defendants.       )
_____)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Ayman Fareh Soliman is an Egyptian national who has resided in the United States since receiving asylum status in June 2018.  Compl. ¶ 1 [Dkt. # 1].  He accepted an offer to work as a Muslim Chaplain for the Oregon Department of Corrections ("ODOC"), but he was ultimately unable to take the job because of an "unresolved 'FBI flag' preventing his clearance."  Compl. ¶ 1.  Plaintiff believes that his name may be included in a terrorist watchlist, Compl. ¶ 22, and he brought this action against the Secretary of the Department of Homeland Security ("DHS"), the Attorney General of the United States, the Director of the Federal Bureau of Investigation ("FBI"), and the Director of the FBI's Terrorist Screening Center ("TSC").  The complaint consists of eight counts:

> Count I – violation of plaintiff's right to procedural due process by all defendants, Compl. ¶¶ 26–35;
>
> Count II – violation of plaintiff's right to substantive due process by all defendants, Compl. ¶¶ 36–41;
>
> Count III – violation of plaintiff's right to equal protection based on his religion by the Secretary of the DHS, Director of the FBI, and the Director of the TSC, Compl. ¶¶ 42–49;

Count IV – violation of plaintiff's right to equal protection based on his national origin by the Secretary of the DHS, Director of the FBI, and the Director of the TSC, Compl. ¶¶ 50–54;

Count V – violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, by the Secretary of the DHS, Director of the FBI, and the Director of the TSC, Compl. ¶¶ 55–61;

Count VI – violation of the Privacy Act of 1974 ("the Privacy Act"), 5 U.S.C. § 552a *et seq.*, by the Director of the FBI and the Director of the TSC, Compl. ¶¶ 62–72;

Count VII – declaratory relief, Compl. ¶¶ 73–74;

Count VIII – attorney's fees under the Equal Access to Justice Act, Compl. ¶¶ 75–77.

Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Rule 12(b)(6). *See* Defs.' Mot. to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim [Dkt. # 13] ("Defs.' Mot."). Plaintiff opposes the motion, and the matter is fully briefed. *See* Pl.'s Resp. in Opp. to Defs.' Mot. [Dkt. # 15] ("Pl.'s Opp."); Defs.' Reply in Supp. of Defs.' Mot. [Dkt. # 16] ("Defs.' Reply"); Defs.' Notice of Supp. Auth. [Dkt. # 17] ("Defs.' Notice); Pl.'s Obj. to Defs.' Notice [Dkt. # 18]; Pl.'s Notice of Supp. Auth. [Dkt. # 22] ("Pl.'s Notice"); Defs.' Resp. to Pl.'s Notice [Dkt. # 24].

For the reasons stated below, while the Court will **DENY** the motion to dismiss Counts I – V on standing grounds, it will **GRANT** defendants' motion in part and dismiss the Privacy Act claim (Count VI) under Rule 12(b)(1) for lack of standing, and it will dismiss the substantive due process, equal protection, and APA claims under Rule 12(b)(6) for failure to state a claim (Counts II–V). Based on the matters discussed at a hearing conducted on November 22, 2024, plaintiff will be afforded an opportunity to amend Count I.

## BACKGROUND

### I.    The Terrorist Screening Dataset

The Terrorist Screening Center is a multi-agency center administered by the FBI that consolidates the federal government's terrorist watchlists into a single database. *See* Overview of the U.S. Government's Watchlisting Process and Procedures as of September 2020, Ex. 1 to Defs.' Mot. [Dkt. # 13-1] ("Watchlist Procedures") at 2.  The TSC manages the Terrorist Screening Dataset ("TSDS"), commonly referred to as the Terrorist Watchlist.[1]  Watchlist Procedures at 1–2. An individual can be nominated to the TSDS if there is sufficient information establishing a "reasonable suspicion that the individual is a known or suspected terrorist."  Watchlist Procedures at 3.  While other agencies and foreign partners may nominate individuals for inclusion in the TSDS, the TSC has final authority to either accept or reject the nomination.  Watchlist Procedures at 3, 5.  The TSC also has the final authority to remove someone from the list if, for example, there is a misidentification.  Watchlist Procedures at 7.

The No Fly List and Selectee Lists are subsets of the TSDS, but nomination to these lists must satisfy additional criteria distinct from those used for inclusion in the TSDS.  Watchlist Procedures at 4.  The TSC is responsible for determining whether the requisite information meets criteria for inclusion on the No Fly List and Selectee List.  Watchlist Procedures at 4.

Individuals facing "travel-related screening difficulties" related to their inclusion on the TSDS may use the DHS Travel Redress Inquiry Program ("DHS TRIP") to seek assistance with those issues.  Watchlist Procedures at 7.  After an individual has submitted a complaint to the DHS

---

1    As both parties acknowledge, until recently, the TSDS was known as the Terrorist Screening Database or the "TSDS," *see* Defs.' Mot. at 4; Pl.'s Opp. at 3, and the terms are used interchangeably in the pleadings.  The Court will use the more recent "TSDS" for consistency and accuracy.

TRIP office, the TSC Redress Office independently reviews the complaint. Watchlist Procedures at 8. If the traveler is positively matched to an identity in the TSDS, TSC reviews the available information to determine whether the individual continues to satisfy the criteria for inclusion or should otherwise be removed or modified. Watchlist Procedures at 8. When changes to a TSDS record are warranted, TSC's Redress Office makes the corrections.[2] Watchlist Procedures at 9. When the review is complete, DHS TRIP sends a determination letter advising the traveler of the results of this adjudication. Watchlist Procedures at 9. Generally, the agency's policy is neither to confirm or deny a person's watchlist status. Watchlist Procedures at 9.

## II.    Factual Background

Plaintiff is a practicing Muslim of Egyptian national origin who accepted a position with the Oregon Department of Corrections to serve as a Muslim Chaplain. Compl. ¶¶ 8, 10. According to the complaint, the ODOC Religious Services Unit Administrator "described Mr. Soliman as highly qualified based on his education and work history, noting that [he] 'rose to the top of the candidate pool.'" Compl. ¶ 11.

On February 4, 2021, ODOC initiated a Law Enforcement Data System ("LEDS") check, and plaintiff asserts that successful clearance of this step was a prerequisite for employment. Compl. ¶ 12. The check allegedly came back with an "FBI flag," providing a phone number to call. Compl. ¶ 12. Plaintiff states that ODOC's Religious Services Manager, Stuart Young, contacted the FBI "but received no resolution at that time." Compl. ¶ 13. As a result, ODOC

---

2      The TSA Administrator "makes final determinations concerning listing[s] on the No Fly List." Watchlist Procedures at 9 n.5. In cases involving the No Fly List, the TSC Redress Office prepares a recommendation for the TSA Administrator and implements the Administrator's determination. Watchlist Procedures at 9.

rescinded the employment offer, informing plaintiff that he had not cleared the background check. Compl. ¶ 14.

To find out why he did not clear the background check and "mak[e] clear that he was wrongly placed on an FBI list," plaintiff submitted his fingerprints to the Oregon State Police. Compl. ¶ 15.  On February 16, 2021, the Oregon State Police allegedly told Mr. Young that plaintiff was not a match with the FBI record flagged on his LEDS record.  Compl. ¶ 15.  ODOC then extended plaintiff a second employment offer to work at the Two Rivers Correctional Institution ("Two Rivers") in Umatilla, Oregon.  Compl. ¶ 16.  Plaintiff accepted the second offer and moved to Oregon to begin his employment.  Compl. ¶ 16.

The Two Rivers onboarding process required plaintiff to obtain a Criminal Justice Information Services ("CJIS") clearance to enter the facility.  Compl. ¶ 17.  On April 1, 2021, Two Rivers took plaintiff's fingerprints and sent them to the Oregon State Police for processing. Compl. ¶ 17.  On April 7, 2021, the Oregon State Police denied plaintiff's "clearance based on the FBI flag, which remained unresolved."  Compl. ¶ 18.  As a temporary solution, plaintiff began teleworking for ODOC while attempting to resolve the background check problem.  Compl. ¶ 19.

Plaintiff alleges that he then "initiated a DHS TRIP [] action to determine if he had been placed on the No Fly List or any watchlist."  Compl. ¶ 20.  On September 24, 2021, DHS TRIP sent plaintiff a letter indicating that it had reviewed his case, and that it could "neither confirm nor deny any information about [him] which may be within federal watchlists or reveal any law enforcement sensitive information."  Compl. ¶ 21; *see also* DHS September 24, 2021 Letter, Ex. 3 to Defs.' Mot. [Dkt. # 13-3] ("Redress Order") at 1.  The letter did state that the agency had "made any corrections to records that [its] inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification."  Redress Order at 1.  It also

informed plaintiff that it constituted the agency's "final [] decision," and that he had sixty days to seek review of the decision in United States Court of Appeals pursuant to 49 U.S.C. § 46100. Redress Order at 2. Plaintiff alleges that the response he received is consistent with those received by individuals who are not on the No Fly List but are in the TSDS. Compl. ¶ 21.

On September 23, 2021, ODOC terminated plaintiff in order to fill his position with someone who could enter the facility, notwithstanding its alleged "continuing . . . desire to employ" him. Compl. ¶ 23. ODOC also allegedly recommended that plaintiff "re-apply should he ever clear the FBI flag on his background check." Compl. ¶ 24. The gravamen of plaintiff's complaint is that he has not been provided with notice of any reason why he may be included in the TSDS or an opportunity to challenge that designation.

## LEGAL STANDARD

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (applying principle to a Rule 12(b)(1) motion). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (rule 12(b)(6) case); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (rule 12(b)(1) case).

## Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*,

the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79, citing *Twombly*, 550 U.S. at 555–56.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler*, 617 F.2d at 608. Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

**I.    Plaintiff has standing to bring his procedural due process, substantive due process, equal protection, and APA claims, but not his Privacy Act claim.**

Defendants challenge plaintiff's standing on causation and redressability grounds, arguing that they "did not cause [plaintiff's] injury," and that "a ruling against [them] would not redress his injury." Defs.' Mot. at 1, 12. Plaintiff contends that defendants did cause his injury by including him in the TSDS with an "an FBI flag," which led to the termination of his employment at ODOC and prevents him from being hired again in his preferred profession. Pl.'s Opp. at 9; Compl. ¶¶ 23, 32. He also asserts that the requested relief would redress his injury by "provid[ing] him with a method to learn and challenge the reasons for this FBI flag" so that he can "re-apply for the position he wanted." Pl.'s Opp. at 10.

**A.    Plaintiff has plausibly alleged that his injuries in Counts One through Five are fairly traceable to the challenged conduct, and that it is likely they would be redressed by a ruling in his favor.**

For constitutional standing, the plaintiff must show: (1) that he has suffered an "injury-in-fact"; (2) that the injury is "fairly traceable" to the challenged action of the defendant; and (3) that it is "likely, as opposed to merely speculative," that a favorable decision will redress the injury. *Lujan,* 504 U.S. at 560–61 (citations omitted). When the latter two elements, causation and redressability, hinge on an independent third party not before the court, the Supreme Court has cautioned that standing "is ordinarily 'substantially more difficult' to establish." *Lujan,* 504 U.S. at 562 (citations omitted); *Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022).

Here it is undeniable that the Oregon officials were the ones who made the decisions to rescind plaintiff's first offer and to terminate the employment in the position he was able to receive. But that is not the end of the inquiry as the federal government suggests. To establish causation when an alleged injury results from a third party's independent actions, the plaintiff must allege

facts sufficient to show that the defendant's "action is at least a substantial factor motivating the third part[y's] actions." *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016), quoting *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001). In *Tozzi v. U.S. Department of Health & Human Services*, manufacturers of plastic medical products containing dioxin challenged the decision of the Secretary of Health and Human Services to add dioxin to the "known" carcinogens list. 271 F.3d at 303–04. The suit alleged that the designation would deter customers from purchasing the company's products and prompt state agencies to regulate products containing dioxin. *Id.* at 307–08. On appeal from summary judgment, the Court held that plaintiffs satisfied causation based on evidence demonstrating that municipalities and health care organizations opted to phase out their use of plastic containing dioxin as a direct result of the Secretary's decision. *Id.* at 308–09. Because the evidence showed that the government's statement regarding dioxin was a substantial factor motivating the decisions of the third parties that were directly responsible for plaintiffs' injuries, the Court held that the plaintiffs had standing. *Id.* at 309.

Plaintiff's complaint gets over this hurdle at the motion to dismiss stage. He alleges that ODOC rescinded the first offer and terminated him from the second position due to the "the FBI flag" that caused him to fail the background check. Compl. ¶¶ 14, 17–24. Plaintiff adds that ODOC "recommended that Mr. Soliman re-apply should he ever clear the FBI flag on his background check." Compl. ¶ 24. The defendants insist in their motion to dismiss that they lack control over state hiring and that Oregon was free to hire or retain the plaintiff notwithstanding the results of the background check. Defs.'s Mot. at 15. But taken as true at this stage of the case, plaintiff's allegations are sufficient to allege that the FBI flag was a substantial factor in ODOC's decision to terminate him, and that plaintiff's injury is fairly traceable to defendants.

Plaintiff also satisfies the redressability component of standing.  A plaintiff must also show "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  Although causation and redressability are two separate elements, they "overlap as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997).  To establish redressability when third-party conduct is involved, plaintiffs must allege facts "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).

Here again, when one views the allegations in the light most favorable to the plaintiff, the complaint alleges that there is a substantial likelihood that ODOC would hire plaintiff if not for the flag revealed during the background check.  Therefore, the Court will deny the motion to dismiss Counts One through Five for lack of standing.

### B. Plaintiff does not have standing for his claim under the Privacy Act because he has not sufficiently alleged a disclosure by defendants caused his injury.

The Privacy Act "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records." *Bartel v. FAA*, 725 F.2d 1403, 1407 (D.C. Cir. 1984); 5 U.S.C. § 552a (a)(1)–(b)(2).  Section 552a(g)(1) of the statute authorizes a private individual to bring a civil action for an injury resulting from personal information improperly maintained, disclosed, or collected by a federal agency.  5 U.S.C. § 552a(g)(1)(A)–(D).  Therefore, to establish standing for a Privacy Act claim, the plaintiff must allege a "concrete and particularized" injury-in-fact that is "fairly traceable" to defendants' improper maintenance, disclosure, or collection of plaintiff's personal information.  *Lujan*, 504

U.S. at 559–62 (citation omitted); *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press.").

Count Six alleges that defendants Wray and Kable are liable in their official capacities for prohibited disclosures made by their agents.  Compl. ¶ 63.  Putting aside the legal question of whether it could be "improper" under the Privacy Act for the FBI to make information available to other law enforcement agencies, plaintiff has failed to meet the causation standard here.  First of all, the complaint contains no factual allegation that an FBI agent disclosed anything to anyone.[3] Paragraph 12 alleges that in February 2021, when ODOC initiated a Law Enforcement Data System background check, it "came back with an 'FBI flag' and provided a number to call." Compl. ¶ 12.  Paragraph 13 alleges that the Religious Services Manager in Oregon then "contacted the FBI but received no resolution at that time."  Compl. ¶ 13.  There is no allegation that the individual who received the call shared any information with Oregon officials, and there is no other factual allegation about communication with the FBI concerning the plaintiff in the complaint.  And plaintiff asserts that after he was employed, it was the Oregon State Police, not defendants, who informed the Two Rivers facility that plaintiff's clearance was denied "based on the FBI flag, which remained unresolved."  Compl. ¶ 18.

Moreover, even if one could generously conclude that implicit in paragraph 13 is an allegation that during the call placed by the Religious Service Manager, an FBI agent confirmed

---

3    Plaintiff asserts in Count VI that "defendants willfully and/or intentionally violated the Privacy Act because the disclosure that Mr. Solimon's background check returned an 'FBI flag' was made without a need to know.  Merely sharing that Mr. Solimon did not clear the background check would have been sufficient."  Compl. ¶ 68.  These confusing sentences written in the passive voice do not fill the gap because the person or entity that did the disclosing or sharing is not identified.

the existence of an FBI flag connected with the plaintiff, there are no facts alleged connecting plaintiff's injury to that disclosure. Paragraph 12 asserts that Oregon officials were made aware of the flag through the LEDS check, which took place *before* the call to the FBI phone number provided. Compl. ¶ 12. And plaintiff makes it clear throughout his complaint that "successful clearance of the [background] check is a prerequisite for beginning employ," and that Mr. Soliman did "not clear[] the background check." Compl. ¶¶ 12, 14, 17; *see also* Compl. ¶ 23 ("ODOC terminated Mr. Soliman so that it could fill the position with someone who could enter [Two Rivers]."). In other words, the complaint asserts that it was the existence of the flag and failing the background check that led to plaintiff's injury, and not any information disclosed by the FBI. Therefore, plaintiff's Privacy Act claim will be dismissed for lack of standing because he has not sufficiently alleged that his injury – the lost employment opportunity – was caused by the defendants' disclosure of any information.

## II.    Counts Two through Five fail to state a claim.

While plaintiff may have standing to bring his substantive due process, equal protection, and APA claims, they all fail on the merits.

### A. Count Two does not allege a substantive due process claim because there are no allegations of conduct that shocks the conscience.

In Count Two, plaintiff alleges that defendants violated his substantive due process rights under the Fifth Amendment. He complains that by "[m]erely stating that [plaintiff] has an FBI flag associated with his profile," defendants violated his substantive rights in "suggesting that he is a threat or otherwise has committed some wrong" without "articulating why." Compl. ¶ 40.

The substantive component of the Due Process Clause provides "protection against government interference with certain fundamental rights and liberty interests." *Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007), quoting

*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  To bring a substantive due process claim, a plaintiff must allege that "egregious government misconduct" deprived him of a constitutionally recognizable "liberty or property interest."  *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 206, 209 (D.C. Cir. 2003).  This can be broken into two elements:  (1) the existence of a liberty or property interest, and (2) governmental misconduct directed toward that interest that shocks the conscience.  *Id*.

While plaintiff has plausibly alleged a liberty interest, his claim fails because he has not alleged any government conduct that shocks the conscience.  Count Two alleges that plaintiff's "fundamental liberty interest" is "[t]he right to practice a chosen profession."  Compl. ¶ 39.  The "right to follow a chosen trade or profession" can be a cognizable liberty interest if the plaintiff alleges that the government's action precludes him from pursuing his chosen profession entirely, as opposed to "merely" barring him from "one position" in the profession.  *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994), quoting *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895–96 (1961).  Mr. Soliman alleges that he "desires to work as a Chaplain with ODOC, or another state or federal prison system," and that "[p]resumably, any employment with any state's Department of Corrections will require [him] to successfully pass a background check, which he cannot do while the FBI flag remains on his profile."  Compl. ¶ 30.  While this is somewhat conclusory, plaintiff's allegation that the defendants' flag bars him from any work in a public penal institution is sufficient to state a plausible cognizable liberty interest at this stage of the proceedings.

But the substantive due process claim falls short at the second element in any event.  Plaintiff must allege that "state officials are guilty of grave unfairness in the discharge of their legal responsibilities," *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988), and have acted

"so egregious, so outrageous, that it may be fairly said to shock the contemporary conscience." *Est. of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006), quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998).  Conduct showing "grave unfairness" falls into two categories:  (1) "a substantial infringement of state law prompted by personal or group animus," or (2) "a deliberate flouting of the law that trammels significant personal or property rights." *Silverman*, 845 F.2d at 1080.  Here, plaintiff simply repackages the allegations underlying his procedural due process claim to claim a substantive due process violation.  *See* Compl. ¶ 40 ("[S]tating that Mr. Soliman has an FBI flag associated with his profile . . . without articulating why or providing more than a mere few words is a violation of Mr. Soliman's substantive due process rights.").  But he does not allege conduct motivated by improper animus or that amounts to a deliberate or shocking flouting of the law.  For these reasons, Count Two will be dismissed.

**B.  Counts Three and Four do not allege facts to support equal protection claims.**

In Counts Three and Four, plaintiff alleges that he was included in the Terrorist Screening Dataset due to his religion, Islam, and nation of origin, Egypt, in violation of his right to equal protection of the law guaranteed by the Fifth Amendment.  Compl. ¶¶ 42–54.

The Equal Protection Clause bars the government from "deny[ing] any person within its jurisdiction the equal protection" of law.  U.S. Const. amend. XIV.  This mandate requires state actors to treat similarly situated persons alike, *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985), and protects against intentional and arbitrary discrimination, "whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 352 (1918).

To succeed on an equal protection claim, though, the plaintiff must allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  In addition,

the Supreme Court has "made clear" that "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (internal quotation marks and citation omitted); *Snowden v. Hughes*, 321 U.S. 1, 8 (1944) ("The unlawful administration by [government] officers of a [law] fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is . . . a denial of equal protection [only if] there is shown to be present in it an element of intentional or purposeful discrimination.").

Count Three alleges, "[u]pon information and belief, Mr. Soliman's inclusion in the Watchlist is based on his religion," Compl. ¶ 43. Similarly, Count Four alleges, "[u]pon information and belief Mr. Soliman's inclusion on the Watchlist is based on his national origin." Compl. ¶ 52. These sentences are entirely conclusory, and therefore, they need not be accepted as true, and the counts contain no other factual allegations that would support a plausible inference of discrimination. Furthermore, neither count includes information that would point to the conclusion that Muslims or people of Egyptian origin are treated differently in connection with the creation or management of the watchlists. In the absence of such facts, the complaint falls short of alleging that purposeful discrimination occurred "because of, not merely in spite of, [an action's] adverse effects upon an identifiable group . . . ." *Ashcroft*, 556 U.S. at 681 (internal quotation marks and citation omitted). For these reasons, plaintiff has not properly stated a claim of disparate treatment and his equal protection claims fail.

### C. Count Five does not allege facts to support a claim under the APA because it does not challenge an agency action.

Plaintiff entitles Count Five, "Violation of the Administrative Procedure Act by Defendants Mayorkas, Wray, and Koble." In the count, he alleges that "[d]efendants' policies and practices allow, or fail to prevent, arbitrary and capricious decision making, constituting final

agency action under the meaning of the APA."  Compl. ¶ 58.  He also generally complains, as he does throughout the complaint, about the absence of a procedural mechanism to challenge the receipt of an FBI flag or being included in the TSDB.  Compl. ¶¶ 34–35, 48.  But this does not state a claim under the APA.

Section 706(2)(A) of the APA authorizes courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  "Agency action" is defined in the statute as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Taken together, these provisions make it clear that mere "policies and practices" do not constitute "final agency action under the meaning of the APA," as the plaintiff contends in paragraph 28 of the complaint.  Indeed, as defendants point out, plaintiff's APA claim is based upon the very alleged deficiencies addressed in his procedural due process claim.  Defs.' Reply at 18.  Plaintiff admits as much when he insists that in Count Five, "he plausibly allege[d]" a challenge to "the Government's redress *procedures*."  *See* Pl.'s Opp. at 20 (emphasis added).  This is not a challenge that is cognizable under the APA, and Count V will be dismissed.

### III.    Plaintiff may amend Count One.

Count One alleges that defendants violated plaintiff's Fifth Amendment right to procedural due process by depriving him of his property interest in his chosen profession.  Compl. ¶¶ 27–29.  He asserts that he hopes to work as a Chaplain for ODOC or another state or federal prison, and that "any employment" of this kind will require him to pass a background check, which "he cannot do while the FBI flag remains on his profile."  Compl. ¶ 30.

In paragraph 22 of his complaint, plaintiff states, "[u]pon information and belief, [p]laintiff reasonably believes himself to be on a government [w]atchlist or named in the TSDB," Compl. ¶ 22, that is, the Terrorist Screening Database maintained by the Terrorist Screening Center, which is alleged in paragraph 5 to be a multi-center agency that is administered by the Federal Bureau of Investigation.  Comp. ¶¶ 4–5.  He maintains that he is being denied due process as he has not been provided with notice of the reasons for his designation or an adequate means to challenge being included on the watchlist.  Compl. ¶¶ 28, 33–35.  He states in paragraph 34 of the complaint, "Mr. Soliman exhausted his only avenue of administrative remedy – DHS TRIP – and is no better off than when he started.  The existing procedures provide him with no means to challenge his inclusion or even determine what triggered his inclusion."  Compl. ¶ 34.

The defendants moved to dismiss Count One for lack of subject matter jurisdiction.  Defs.' Mot. at 17–19.  They characterize the count as a challenge to the sufficiency of the DHS TRIP process, and they maintain that the Court of Appeals has exclusive jurisdiction over the claim under 49 U.S.C. § 46110.  *Id.* at 18.  Section 46110(a) provides that: "a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration . . . or the Administrator of the Federal Aviation Administration) . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit . . . ."  49 U.S.C. § 46110(a).

Plaintiff responds in opposition:

> But Plaintiff does not name the TSA as a defendant.  Nor does Plaintiff challenge the DHS TRIP decision he received.  Instead, he challenges the FBI's and TSC's presumed decision to place him on a watchlist, and the policies and procedures of those agencies which made that placement possible without affording him a meaningful opportunity for him to challenge the decision and be heard.

Pl.'s Opp. at 5. While the complaint is far from a model of clarity, and defendants' confusion is understandable, this statement appears to be consistent with the complaint. Nonetheless, the defendants argue in their reply:

> Plaintiff asserts that he does not actually challenge DHS TRIP, and instead challenges FBI and TSC's purported decision to place him on a watchlist "without affording him a meaningful opportunity for him to challenge the decision and be heard." . . . But even if that were his claim, the "meaningful opportunity to challenge that decision and be heard" *is* the DHS TRIP process—which Plaintiff himself invoked and concedes is his "avenue of administrative remedy." *See* Compl. ¶ 34 ("Mr. Soliman exhausted his only avenue of administrative remedy—DHS TRIP—and is no better off than when he started."); *see also id.* ¶ 54 ("Plaintiff has exhausted his only available remedy: DHS TRIP.").

Defs.'s Reply at 8.

In support of their motion, the defendants provided the Court with an unclassified document entitled, Overview of the U.S. Government's Watchlisting Process and Procedures as of September 2020. *See* Watchlist Procedures. After reviewing the pleadings and the Watchlist Procedures, the Court was unable to square defendants' statement that "the DHS TRIP process . . . is [plaintiff's] avenue of administrative remedy" with the information contained in the Watchlist Procedures, which states in the Redress Process section: "The DHS Traveler Redress Inquiry Program (DHS TRIP) is a resource for individuals who believe they have been unfairly or incorrectly delayed, denied boarding, or identified for additional screening or inspection at airports or U.S. ports of entry." Watchlist Procedures at 7.

The Court then asked the government to identify the authority upon which it relied – other than plaintiff's own allegation that he invoked the only process of which he was aware – to support its legal position that a person may seek redress in connection with "being named in the TSDB" through the DHS TRIP process in the absence of any "travel-related screening difficulties." Watchlist Procedures at 7; *see* Order (Sept. 30, 2024) [Dkt. # 25] ("September 30 Order").

Defendants responded, "[t]he DHS TRIP process was [p]laintiff's 'avenue of administrative remedy' because he did, in fact, complain of travel related difficulties . . . . his inquiries were reviewed, and he received final determination letters from DHS TRIP at the conclusion of the reviews." Defs.' Resp. to September 30 Order [Dkt. # 26] at 1–2. This did not appear to answer the Court's inquiry – that is, how can a person who is *not* on the No Fly List, which the Overview describes as "a subset of the TSDB," challenge being named in the TSDB? So, the Court issued another order asking several pointed questions:

> 1) Can a person who believes that they are included in the TSDB seek relief through the DHS TRIP process in the absence of travel related difficulties? 2) If the answer to that question is no, what is the available administrative remedy, if any, for a person who believes themself to be on the TSDB but who is not experiencing travel related difficulties? 3) Is the DHS TRIP process the only available administrative remedy for any individual who believes himself to be named in the Terrorist Screening Database, with or without travel difficulties? If not, what else is there?

Minute Order (Oct. 9, 2024) ("October 9 Minute Order").

The government's answer to the first question was crystal clear: "No." Defs' Resp. to October 9 Minute Order [Dkt. # 28] at 1. It batted away the second question, saying "this issue is not before the Court because Plaintiff claims to have experienced travel-related difficulties on at least fifteen separate occasions." *Id.* at 2. And while defendants insisted that there were other administrative remedies for an individual who believes himself to be named in the Terrorist Screening Database with or without travel difficulties, all of the options it described related to travelers. *See id.* at 3 ("[T]he Transportation Security Administration . . . has separate processes . . . to address denials of transportation credentials."); *id.* ("U.S. Customs and Border Protection . . . has an Ombudsman review process for travelers who believe they were improperly denied membership in a CBP Trusted Traveler Program . . . .").

The Court reads the complaint as an effort to challenge the lack of notice and an opportunity to be heard surrounding plaintiff's assumed inclusion on the TSDB by the FBI and/or the TSC, and not travel related problems suffered at the hands of TSA.  Given the rulings by the D.C. Circuit in *Abdellatif v. United States Department of Homeland Sec.,* 109 F.4th 563, 567 (D.C. Cir. 2024) that it was only permitted to review orders under section 46110 to the extent those orders pertain to TSA, and that Abdellatif's claims were otherwise not redressable because "TSC, not TSA, is the 'sole entity with . . . the authority to remove names' from the TSDS," *id.* at 568, the Court had questions concerning defendants' motion to dismiss for lack of jurisdiction under section 46110, and it scheduled a hearing.

During the hearing, counsel for the government pointed out that while it is true that one must allege travel related problems to obtain access to the DHS-TRIP process, the Watchlist Procedures state that once a request for redress is filed, if it is determined that the traveler is a positive match to an identity in the TSDB, the analyst within the TSC Redress Office will review whether "the identity in the TSDB continues to satisfy the criteria for inclusion or should be removed or have its status otherwise modified."  Watchlist Procedures at 8.  In other words, according to the defense, for some people, including the plaintiff, the DHS-TRIP process does provide an avenue to challenge inclusion on the TSDB.  But counsel for plaintiff argued that while individuals on a No Fly List are given information concerning the reasons for being listed and an opportunity to dispute them, individuals on the TSDB are treated differently.  Even if the agency may review the designation internally, the individuals involved receive nothing other than the uninformative information plaintiff received in his redress letter from DHS TRIP:

> DHS has researched and completed our review of your case.  DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive

information. However, we have made any corrections to records that our
inquiries were determined were necessary.

Ex. 3 to Defs.' Mot [Dkt. # 13-3] at 1.  In short, according to the plaintiff, if one is not on the No

Fly List, there is no avenue to seek redress from TSC.  And challenging the letter in the Court of

Appeals would be to no avail since TSA is not the source of the problem.

Since the complaint, which was written two years ago, does not articulate the precise claim

before the Court as artfully as plaintiff may be able to do now, and since the government has not

yet articulated the grounds for dismissing the claim as clarified, the Court finds in its discretion

that it is prudent to give plaintiff an opportunity to amend Count One and defendants an

opportunity to file a more targeted responsive pleading.

## CONCLUSION

For the reasons set forth above, the Court will **GRANT** defendants' motion [Dkt. # 13] in

part and dismiss Counts II, III, IV, V, and VI, and Count I will be dismissed without prejudice.

Plaintiff is granted leave to file an amended Count I by December 20, 2024, the government's

responsive pleading will be due on January 21, 2025.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  November 25, 2024